M.D. and Rockford Kinesiologists Associated, LLC, for the examination. Arguing on behalf of Mr. Allen, Mr. Francis J. Lahey III. Arguing on behalf of the attendees, Mr. Stephen A. Riegel. Arguing on behalf of the attendees, Mr. Robert Fogelman. Arguing on behalf of the attendees, Mr. Robert Fogelman. This is a medical negligence case in which the jury rendered the verdict in favor of the defendants who were asking to overturn that verdict. And we understand that you need some good reasons to interfere with the jury's verdict. We think there are three. We think that each one of them is sufficient in and of itself to justify reversal in this case. The first, and probably the foremost, certainly Ms. Lloyd-Merrigan, in the brief, the jury was not free to disregard unrebutted standard of care evidence. And in this case... Now, let's be specific. Which standard of care argument are we talking about? All right. The particular issue that we're talking about here is the progress note, the false progress note that was written by Dr. Gandhi on October 22 when he was summoned to the hospital room for Mrs. McCann by Nurse Vita Williams. So you say there was a deviation of standard of care by not charting correctly. That's correct. Okay. And Dr. Reed, who was the plaintiff's standard of care expert, provided that testimony, and I've quoted that in the papers that you have. So how is that violation of standard of care not charting? How does that equate to the negligence? What it did was it created a situation where the condition of the plaintiff, this development of a perforation in her esophagus or hyperpharynx or peripheral sinus, I mean, the different medical testifiers had some differences in vocabulary, but they all agreed that something happened in the operating room prior to Dr. Soni coming in to perform the double mastectomy. And as a result, she suffered some injury that later created this descending mediastinitis that resulted in a 39-day hospital stay in the University of Wisconsin and the three surgeries and the removal of what Dr. Reed called a big ball of pus. But the initial charting at the time of the surgery was that there were two attempts, correct? Yes. In the surgical record, there is a note that says there were two atraumatic intubations. However, that's in the surgical record. After the surgery, what happened is the patient began complaining of extreme 10 of 10 pain, and the nurse who was handling her care, Ida Williams- Would you stop that with your pen? I'm sorry. It's just distracting me. Thank you. Recognized that this was not chest pain related to the double mastectomy, but rather was throat pain that was related, she believed, to the anesthesiologist. And so she asked for Dr. Gandhi, the anesthesiologist, to come up to the hospital room to check on the patient. And when he came to the hospital room, he tells Nurse Williams, and she charts this, that he did not perform any intubation of her esophagus, and he makes the progress note that there was one easy atraumatic intubation. So the progress note, which is the thing on top, the thing that everybody looks at and relies on, that Dr. Ganatherian quoted in her discharge summary, is one easy atraumatic intubation. But technically, he, Dr. Gandhi, only made one. Right? True. Absolutely. We believe. Because he said, Max Vest does not remember what happened in the operating room at all. That's his testimony. And the testimony of Dr. Gandhi is that Vest made an attempt, and then he discovered, Dr. Gandhi discovered that he had- He did it incorrectly because there was a- Right. So he had to re-intubate. Right. Right. If he didn't see an injury, he just knew that it was not properly intubated. Correct? Right. In fact, he denied repeatedly that there was any injury. So are you, just to move us along, so you're submitting, then, that his indication that there was only one maybe gave the wrong impression to the nurse as well as the doctor that released her. Right. Dr. Sonia, the surgeon. Because what he testified to was once he knew, and this is what I quoted in the papers here, it's R1589-20-24, knowing that the patient had only had one attempt at intubation, and assuming that was true, and the tube was in the correct position, then yes, I definitely did not suspect an esophageal perforation. And of course you wouldn't suspect an esophageal perforation if there was only one intubation, because if there was only one intubation and it went into the esophagus, and it wasn't corrected, Bonnie McCann would have died. Anybody would have died. You have to have- You can't put the air into the esophagus. It has to go into the trachea to get down to the lungs. But Sonia said, had the notes reflected two attempts, that it wouldn't have changed his position, right? Well, no. So how do you address that? No, he responded that that's not really what his testimony is. His testimony was, as I quoted, because he knew there was only that one attempt, that's the key for him. And so, you know, there were other things. There were other things that were involved. She responded to the myelantha and to the pain medication that she was given. She appeared to improve. She had no signs of an esophageal perforation. She had no signs of an esophageal perforation. I mean, when he discharged her. No. In terms of the signs of an esophageal perforation are the fever and the, you know. She had some signs in terms of the esophageal perforation, in terms of the extraordinarily bad sore throat and the pain and so forth. So it's not correct to say entirely that she had no signs. She had some signs. She probably did not have that through-and-through hole at the time she left the hospital. Soni said, however, there are many patients, not just with medical students, who have a couple of attempts of intubation. And I don't suspect an esophageal perforation. Right. And that's why. And that's getting to Justice Shostak's question. That is, had the note said, as the operative note said, two uneventful, you know, two uneventful attempts or whatever, it may not have changed anything. We don't know that because it didn't happen. And that's the important thing here. Dr. Soni might have, you know, was responding idly, if you read that testimony in context, to a general statement. And I think that's true. You can have, and I believe the testimony on this was unanimous, that you can have an esophageal intubation without necessarily causing some injury. That can happen. But the fact that there is an esophageal intubation creates at least the possibility that there may be an injury. And then, coupled with the fact that this is a third-year medical student on a second day in the operating room, you have now some reason to be a little bit more concerned than you would ordinarily. Which was, I think, my question, which is the question that I have in this case. You're saying that the standard of care was violated because there was improper charting. Is that really as significant as negligence based upon an intubation that clearly went wrong? Well, I agree with Your Honor that, yes, there was negligence in the intubation, I believe. However, the testimony was both ways. Obviously, Dr. Reed testified that, you know, these things do occur because of negligence. And there was testimony from Dr. Rothenberg and from others that said, well, these things can occur without negligence. And we don't know necessarily one way or the other. That's why I think in terms of looking at what is unrebutted as opposed to something that the jury could resolve, because that's what we're here for. I understand. And that's where I'm coming from. That's why the focus is there, because that part is, I think, perhaps adequately rebutted by the defense testimony, if there's a proper foundation for the defense testimony that was offered. It was not unrebutted that Minority or Minor testified about the charting. It's somewhat rebutted, Dr. Reed. Well, you know, I quoted that exact language in my reply brief, and I believe that's an affirmation of what Dr. Reed testified to as the standard of care. I mean, he said specifically in response to this question, as president of RAA, the defendant, would inaccurate conversations with a floor nurse or inaccurate medical record submissions be less than the standard of care for a member of RAA? This is a jury question. And his testimony was, if they were intentional, obviously. I mean, if it was a mistake or a bad interpretation, communication discourse, I mean, that happens. He said the standard of care permits an inadvertent misstatement. That's true. So isn't it the province of the jury to determine whether the statement that was written was intentional or inadvertent? No, because the testimony was not that it was inadvertent. Dr. Gandhi was given every possible opportunity to address that statement. In fact, you know, both plaintiff and defense basically teed up a beach ball on a tee and said, you know, here, was there, you know, did you see that there was a problem? Did you know that there was a problem? Do you understand now that some injury caused in the operating room? And in all these occasions, he expressly denied completely that anything ever happened. That there were two activations. Right. But he says, you know, he's looking at the totality, and he says that nothing ever happened in the operating room to cause any sort of injury whatsoever. That's his testimony. And he says, when he's asked about the note, and I think this gets directly to your question, when he's asked about the note, he says, well, yeah, I know there were two interventions, but I only wrote one. Why? I don't know. That's his testimony. I don't know. I don't know is not he was given every opportunity to say, you know, I forgot. I made a mistake. It was inadvertent. He didn't do it. I know that, but that's my question. That was my first question, counsel, when you came out. So you have a violation of standard of care because you're submitting, because it was charted incorrectly. But don't you have to tie that violation of the standard of care for charting incorrectly to the injury? And how do you tie the violation of standard of care of charting to the injury? That's why I said, well, isn't it just negligence that there was some improper intubation as opposed to a violation of standard of care as a result of charting? Did you tie that? And the jury obviously didn't feel that that was tied. Right. And I think the jury was improperly instructed, and we'll get to that. Yes. But I have a question before we get there that does, in part, relate. When in trial, wasn't the emphasis, though, on the actual improper intubation as opposed to the charting? Wasn't that more the emphasis in trial, that she was severely injured by probably then, you know, med student vest? I think that the testimony in trial was unanimous from all providers, all experts, all 213F3s, was that she was injured as a result of something that Vest did in the operating room. Like I said, there were differences in vocabulary. But, yes, the testimony was unanimous on that. So that's not even a contested point. But I think in your brief, and I think it's a reply brief, where you say counsel for Dr. Gandhi misunderstands the standard of care because he argues a lot about the injury as opposed to, or the lack of injury, depending on the circumstance, as opposed to the charting matter. What I was getting at there, and this is kind of sliding into point two, and I'm not sure that I've adequately addressed your question, Justice Sussman, but let me just address this and you'll get back to me, I guess. In terms of what Dr. Gandhi said was there was no injury. This is a negligence case, first and foremost, any medical negligence case. You still have the obligation to prove negligence. And so there has to be a negligently caused injury that results in some damages. And his defense, the actual defense, not the defense that I believe the defense counsel anticipated, his actual defense was there was no injury whatsoever. And he persisted in that despite every opportunity given to him by both sides. He's saying there was no injury as a result of the intubation. Wasn't he married to the position that her injuries were as a result of GERD or this other, I don't know what they call this. The Zennickers. The Zennickers. Yeah, the diverticulum, yeah. Yes, but there was never any affirmative opinion evidence offered whatsoever to say that there was GERD or that her injuries were caused by GERD. In fact, his testimony was I don't know what happened. I don't know why she developed this condition. And that was, you know, that was very expressed and was brought out by both sides. I don't know why she developed this condition, but there was no injury. And so part of the confusion that we have in this case is that there was speculation about the Zennickers. There was speculation about GERD. Mr. Fogle brought in the plaintiff's treating physician to establish that contrary to the note that Dr. Gandhi wrote that she suffered from a severe GERD, a reflux, was that she was a long-time patient of his and that she had mild to moderate GERD. So it was not something significant. And there was never one syllable of testimony saying that there was a proximate causal relationship between the descending mediastinitis from which she suffered ultimately and GERD or Zennickers in particular that was punctured. Certainly there was no testimony that said that it was appropriate or within the standard of care for Max Vest to puncture a Zennickers in particular. Causation was an issue. I mean, we've argued, you started off arguing standard of care, but we've slid into causation many, many times during your argument. And you would agree that causation was highly contested, correct? No. Causation was not highly contested? Causation was not contested at all in this trial because everybody agreed that it was something that Vest did in the operating room. There is no contest. Wait a minute. I thought the causation aspect of your standard of care argument is that Sony would not have discharged her. I apologize. I see what you're saying is what's the relationship there. And the relationship there, and this gets back to your question as well, the relationship there is but for the improper charting, the improper information that's put into the medical record, the medical providers, Dr. Sony, who's the surgeon,  My issue is that that was contested at trial. Yeah, that part was contested, certainly. Okay. So let me ask you this. You started off your argument by saying that the jury was not free to ignore the standard of care evidence. How do we know that the jury ignored it? How do we know that the jury didn't find that the standard of care was violated, that there was a deviation, but that it didn't cause any damage to the plaintiff? We have a general verdict on this. We do have a general verdict, but the general verdict, because there is unrebutted standard of care testimony and there was testimony that was unrebutted in terms of causation, and I think it was contested, defense says, in this appeal by Dr. Minori's statement that it had to be intentional in order to be a problem. I don't think that's, first of all, that's appropriate. Nobody is accusing anybody of evil intent here trying to kill Bonnie McCann necessarily. It's just somebody's trying to protect their hide and panicked and did something you should never have done. That happens. But what is the issue here is whether there was testimony that was unrebutted on the issue of proximate cause that this did indeed cause a delay in diagnosis and treatment, and that's unrebutted. And, in fact, Dr. Soni provides additional testimony in that regard because he says he knew from the note that there was only one intubation, therefore he didn't need to worry about esophageal injury. There was no esophageal injury. It couldn't be possible if there was only one intubation. So that's the reason why there's a delay in diagnosis and treatment, and that's what Dr. Reed testified to as a standard of care expert for Plano and connected it up that way. I've taken a long way to go around to it. Let's talk about your jury instruction a little bit. Sure. And we'll give counsel additional time. The 1204 jury instruction, I think the trial court was correct and said the 1204 is a someone and the 1205 is a something. I think that's correct. But the 1204, the notes on these are express. You cannot give it with a third person who might be the sole proximate clause as an agent. Max Vest was not an agent of Dr. Gandhi. He was actually less than an agent. He was basically the crash cart or a glove. He's a tool. He's an instrumentality. And I'm not saying this to denigrate Dr. Vest, who's now a plastic surgeon in Las Vegas or wherever he is. He's a licensed, competent professional, I'm sure. But at the time, he's a second-day medical student, third-year medical student in the operating room in an environment that he's never been before. He is completely under the control of Dr. Gandhi. And so he cannot possibly be the sole proximate clause of any injury to Bonnie McCann. How about the hospital? I'm sorry? How about the hospital? The hospital. The hospital itself? No, I don't think the hospital can be. Certainly there was never any suggestion made in the case that the hospital was in any way responsible. And, again, the person who's responsible for supervising Vest in the operating room is Dr. Gandhi, not the hospital itself. It's the only person who's there to do it. Well, I'm just trying to say maybe they weren't looking at Vest when they asked for the long form. There were two possibilities that the trial court suggested. One was Vest, and notes on you say that's no good. We can't rely on that. The other was Dr. Soni, the surgeon, because Dr. Soni was in charge of her case as the surgeon and discharged her. But Dr. Soni didn't discharge her with all the information. And his testimony was, knowing that I had this one exhibition, I didn't ask, I didn't suspect a sophageal injury. I wouldn't because there couldn't be. It's impossible. So you can't say that he's the sole proximate cause when he is relying on the note, the false progress note, of Dr. Gandhi. Was there an objection at trial to this jury instruction being submitted? Yes. In our statement of facts, we go through the insight to the record for the conference. So that's all there. Then the other, we objected to the use of the long form. And then the other is the 1205 instruction. We wanted to use a 1205 instruction, and that would have given the jury the opportunity to address or assess these other things that were thrown out, the GERD, the Zankers, the other possibilities, of which there was never any affirmative testimony saying that this was a cause of any injury to Bonnie McCann, but yet the names keep coming up during the course of the trial and the witnesses were asked about it castly. So it would have helped the jury, as they go through it, to assess, well, gee, what was this? Were these causes? And even if they were causes, we still have this cause, and therefore we can find in favor of Plano. So because they were not properly instructed, that's the third point. Who blamed, I can't remember because there were so many doctors and witnesses, who blamed part of the issue on Ms. McCann herself because of the way she ate, that she disregarded her illness and ate copious amounts of food? There was testimony about, you know, she was sent home and, you know, she might have eaten normal food at home or, you know, but she was sent home and she could, you know, you've got a sore throat. What do you do when you have a sore throat? You might eat ice cream, you might eat pretzels, you might eat soup. I mean, you're going to have- Pretzels? I was going to say pretzels. Salt feels good on a sore throat. Oh. That's why you take it. But whatever. I mean, the problem is that she had, you know, she was given no specific instructions or obligations. I mean, she was sent home. They didn't know that they had a problem because Dr. Soni didn't know what hoofbeats he was hearing. That was Dr. Minori's testimony, you know, you have to know what hoofbeats you're hearing. Well, Dr. Soni didn't know what hoofbeats he was hearing because he had been improperly advised. He'd been given false information. And intentionally so, I think the record shows, because Dr. Gandhi has no excuse, no explanation, rational or otherwise. Not even the sun got in my eyes or I tripped over a rock. Nothing to explain why he made that note. So with that, I think I, unless there's more questions, I'll subside. All right. You'll have an opportunity to respond if you choose. Thank you. And Mr. Rayfield. And, indeed, we will give you an extra five or six minutes if you need it in order to cover the issues that were raised. Thank you. Well, let me start backwards in a way. I'd like to address the issue of whether the trial court erred by giving the long-form ITI 12.04. The brief filed by the appellant in this case argued that instructions for the use of 12.04 say you're not supposed to give that instruction if the third party, who's allegedly the sole proximate cause of the injury, was an agent of either the plaintiff or the defendant. And the appellant argued in her appellant's brief that Dr. Vest was an agent of Dr. Gandhi. Who argued that? Excuse me? Who argued that?  That's in the appellant's brief. That's the reason presented in the appellant's brief in support of the argument that the trial court erred by tendering 12.04. That's the only reason. Right. But that reason was not raised in the trial court. In the injury instruction conference, there was no argument made that Dr. Vest was an agent of Dr. Gandhi. In the post-trial motion, there was no argument raised that Dr. Vest was an agent of Dr. Gandhi. In the brief, there is no... Wouldn't that be all the more reason why you wouldn't give 12.04? No. The instructions say if you were an agent, you can't give it. And the argument of the plaintiff is that Dr. Vest was an agent and therefore the court could not give 12.04. But that argument was not raised. That's the argument now, but that was not the argument in the trial court. And that is the only argument in the appellant's brief which is raised in support of the contention that the trial court erred by giving 12.04. Vest wasn't listed as a defendant, correct? Was Vest a defendant in the case? No. No, he wasn't. He was not a defendant. Right. And he's not an agent of a defendant, and no one argued he was until now. So you can't, I guess my point is you can't raise for the first time on appeal the fact that 12.04 should not have been given because Vest was an agent of Gandhi. Because that had to be raised in the instruction conference and it had to be raised in the post-trial motion. They objected to 12.04. Not on that basis. No, but they objected to giving 12.04, correct? Okay. Yes, correct. Well, anyway, to get back to my main point, this was a case, and I think a classic case, of competing expert opinions. Dr. Reed, the plaintiff's expert, gave opinions that Dr. Gandhi had violated the applicable standard of care in four separate ways. The defendants presented a number of experts who contradicted each of those opinions that had been rendered by Dr. Reed. Dr. Reed first testified that Dr. Gandhi had violated the applicable standard of care by using what they call the wrong blade in the intubation process. Dr. Gandhi had selected a max-E or a max-4 plexi tip blade. Dr. Reed thought that was inappropriate and that the standard of care required the use of a max-3. Dr. Reed's opinion in this regard was contradicted by Dr. Rothenberg, one of the defendants' experts. I think the reason he's pointing out in his brief only the charting issue with Reed is because, and I don't mean to speak for opposing counsel, but I think he recognizes the standard, the PEDRC standard, as well as the standard for a motion for a new trial, and if those things are contested, we're really not going to jump into the province of the jury. But his argument is that the charting issue was not contested. Well, that was the main argument in the defendant's brief, and it was the main argument raised by counsel here in the oral argument. But also in the appellant's brief, the appellant asked this court to disregard, to basically throw out the opinions on standard of care that had been rendered by the defendant's experts and to throw them out on the grounds that they were all rendered without, well, maybe not all, but most of them had been rendered without proper foundation and that they were speculative and based on guess and conjecture, and therefore that this court should disregard them. Those are additional arguments that were not raised in the trial court. There was no contemporary guess, objections to the testimony of the plaintiff's defendants experts in the trial court. The argument that the defendant's experts' testimony was based on guess and conjecture or it was based on without proper foundation, none of those were raised in the post-trial motion, and therefore all of those are waived for purpose of appeal, in my opinion. What about the charting issue? You're right. That's the main argument raised, is that the opinion of Dr. Reed was that any entry in a progress, patient's progress notes, was inaccurate, whether it was intentionally done or inadvertently done, constituted a violation of the standard of care. But that argument was not unrebutted. Dr. Minori testified that only a deliberate and an intentional insertion of an incorrect statement into a progress note would be a violation of the standard of care. So those are not, I know counsel said those are the same opinions. Those aren't the same opinions. In one case, the intent of Dr. Gandhi is not relevant. In the other case, it is. So the question would be, number one, which one of those competing standards of care did the jury adopt? And if it adopted, the next question would be, if it adopted Dr. Minori's proposed interpretation, was there sufficient evidence in the record for the jury to determine that the entry of the statement in the progress note that Dr. Gandhi had only done one intubation rather than two was not intentionally put in there? And I take two points. I mean, one is he says that it was intentional. But the second point, which maybe takes us out of the realm of a battle of experts, is we're talking about one little quote, unless there's something else in the record that I missed. But apparently the jury asked this question, and it was in response to the jury question. And it's not 100% clear that Minori is saying that every inadvertent misquoting or any inadvertent progress note is not a violation. To me, that doesn't make a lot of sense. Maybe I'm really thinking about 10 other things, and I write down something that is so off that it results in someone being hurt severely. That would never be a violation unless I wrote it intentionally. It's still negligence, isn't it? I think he may have said just because somebody makes a mistake, it doesn't mean it's negligence. I think he said a little. I don't have a testimony. Well, here's his answer. His answer is, if they were intentional, obviously. I mean, if it was a mistake or interpretation or a bad communication discourse, I mean, that happens. But if somebody intentionally falsifies something, yes. So clearly he's saying if someone intentionally falsifies something, that is a violation of the standard of care. The other part, I mean, I just don't know if he's saying that if it's a mistake or bad communication that it's always not a violation of the standard of care. No, that was my interpretation of this testimony. But we're only talking about this one comment, right? I mean, in response to the joint question. That's the only part of the record that that shows up. I mean, is there ever a violation of the standard of care that's intentional? I mean, isn't it unusual for it to be intentional? That would be correct. I mean, it could be, but. That's the opinion that was given at trial. That's Dr. Memori's opinion. And I think I appreciate the Court's comments, but I think he stated it pretty clearly. And I also think there's evidence in the record that shows that that was not intentional. In order for that to be intentional, there would have to have been some motive to make it intentional. Well, does it have? That's my question. Does it have to be intentional in order for it to be negligent? In the opinion of Dr. Memori, yes. In the opinion of Dr. Reed, no. But, I mean, if you're, you know, if, as Justice Berkus said, if you're thinking of 10 other things, and, okay, I have a golf, you know, tee time at 1030. I got to get out of here. And I write it wrong. That's, that doesn't seem to be, that seems to me to be negligence. But that was not Dr. Memori's opinion. I know. And I just, how can it be that a mistake when you are otherwise occupied outside of your job is not negligent? Well, I can't speak for Dr. Memori, and I can't speak for the standard of care personally related to progress notes. But he's a qualified expert on that subject, and that is the opinion he gave. And it was not objected to. All right, no. So it was properly presented to the jury for their consideration. And, in fact, was it examined in any other manner, that issue? You mean like the post-trial motion or something? Right. Did they? No. I don't recall that. I don't recall that. Let me talk about, let's assume for a minute that any statement in a progress note that isn't accurate constitutes negligence and a violation of the standard of care. Let's assume that for a second. That still wouldn't, even if we assumed that Dr. Gandhi had violated the ethical standard of care by making an inadvertent incorrect statement in the progress notes, in order for the plaintiff to wind up with a judgment notwithstanding the verdict, the plaintiff would still have to show that there was overwhelming evidence that that violation of the standard of care was the proximate cause of the plaintiff's injuries. And there isn't any such evidence. First of all, Dr. Shoney testified that although he didn't testify that he recalled reading these progress notes, he testified that that was the standard practice to read them, and therefore he assumed he read them. But it wasn't like he personally recalled what had been in there. But he also testified, first, that the event of two intubations was not an unusual event and that it would not necessarily have changed his opinion about whether the plaintiff should have been discharged or not. And he also testified that the plaintiff at the time of her discharge was not clinically presenting as a patient who had suffered perforated care. But didn't she still have pain that was not necessarily related to the surgical areas? Her throat hurt. That's not where she had surgery. But that was not an unusual post-surgical event even for someone who had not had perforated care. I guess the problem is every time you go into even a doctor's office and you're there because you cut your hand, they ask you, so what's your level of pain, 1 to 10? And if you say 10, they go, whoa, and they start looking at you. If you say, it's bothering me, it's like a 2, they'll put you on the back burner and go to see somebody who's got a 10. What does it mean? At the time of discharge, her level of pain was not 10. What was it? Dr. Gandhi had prescribed for her, I think, the day before the discharge. The myelanthus. The myelanthus, that's correct. And that had a positive effect. Because it cools. It was one of the reasons Dr. Gandhi did not believe that she had suffered a perforated airway. Because patients who have perforated airways and who are given myelanthus typically get worse. They don't get better. And the plaintiff in this case got better. Dr. Zellney testified that no matter what Dr. Gandhi had written in his notes, if the plaintiff had clinically presented as a patient who had had a perforated airway, he would not have discharged the patient, no matter what Dr. Gandhi's opinion was. And by the way, Dr. Gandhi had no opinion, because he didn't even know the plaintiff was being discharged. The only way he found out that she was discharged was he showed up in her room to conduct what he thought was going to be a follow-up examination of her on the day of her discharge and found that she's gone already. So he participated in no way at all in the decision to discharge her. Dr. Zellney's opinion that the plaintiff did not clinically present as someone who had suffered a perforated airway at the time she was discharged was corroborated by Dr. Minori, and it was corroborated also, I think, I think it was Dr. Pandolfi, who was one of the other defendants' experts. So there were three doctors who all concurred that the plaintiff at the time of discharge did not present as someone who had suffered a perforated airway. And that was true no matter what had been written in the progress notes. She just didn't clinically have the symptoms of someone who typically had had that injury. And it's very possible that she was presenting like that because she did not have perforation. The injury would have occurred, but there was testimony at trial, again from the defendant's experts, that the person who was suffering from what they call a synchrocyte reticulum could suffer an injury to the airway, but the injury, because of the particular sponginess, I guess, of the tissue in a synchrocyte reticulum, the injury as a whole would close up on itself right away and wouldn't reappear perhaps for several days after that. So there was testimony in the record. That was the jury could have concluded that at the time the plaintiff was discharged, she hadn't suffered a perforation of her airway. Not all had, but that that happened only after she went home. And ate those pretzels. And ate those pretzels. I don't remember the pretzels. Well, did she testify to what she did eat? Did she testify to what she did eat when she went home? Did anybody ask her that? There was some testimony about that. To be frank, I don't recall what it was. All right. Thank you very much, sir. All right. Mr. Lahane. Let me start where counsel began with the contention that we argued that Vest was an agent. The reference is to page 30 of our brief. The exact wording there is Vest was not just an agent of Dr. Gandhi. He was quite literally merely Dr. Gandhi's shadow. He had no independent right to act in any way except as Dr. Gandhi permitted. So he was less than an agent. Where's the case law supporting all those comments? In terms of Dr. The agency, the agency issue, how 204 shouldn't be used. Oh, that's the notes on use, the IPI instructions themselves. The notes on use are very clear on that. That if there's a third person who could potentially be the sole proximate cause, then you cannot use the 204. The other thing that No, but I'm talking about how you're, okay, I understand that, but then you're arguing as a matter of law that Vest was not an agent of Gandhi. Oh, we discussed that in the reply brief. That was the Knapp v. Hill case. It's not in the white brief. I mean, at some point in time, don't you have to put some law in there on that argument, on the 204 argument? Well, the notes on use are conclusive on that. I think that's what the Supreme Court says to rely on, so I'm relying on that. Is the question, do you know whether, is there an argument to be made whether what Vest's status was vis-a-vis Dr. Gandhi? Is that the issue? Right. Where's the law supporting that he is the agent of Dr. Gandhi? Okay, and that's where I'm going to direct you then to the discussion of Knapp v. Hill in the reply brief, which talks about the Iowa case, the 1959 Iowa case. Basically, what it comes down to is this. Dr. Vest, if you want to call him Dr. Vest, he is now a doctor, could not be independently liable for medical negligence or professional negligence because he was not then a professional. We cite the statutes. He's not eligible to be a doctor at this point. He is still a medical student. He's not yet been licensed. He's not yet been, he's not gone through a residency before. Who is he working for? He is working, he is a medical student who is shadowing Dr. Gandhi as part of a program that they have at a teaching hospital, and Swedish American is a teaching hospital. He's not getting paid. He's not getting a paycheck, so working for is probably not the right word. He is a student, and this is part of his learning process. But he's not an agent. He's not an agent. No, not an agent. I don't think he's an agent at all. He's less than an agent because an agent, I'm an agent of my client. I have some latitude. I may be confined or constrained by the desires of my client, but within those constraints, I have some latitude to act or to argue. Dr. or Mr. Best, Max, let's call him Max, Max had no authority to do anything except as Dr. Gandhi directed because he was not a professional. As the Iowa case that was cited in the Napkin Hill talks about, there are administrative tasks or semi-professional tasks that a medical student may be asked to perform, but that does not make him independently liable for professional negligence. You're not a professional. Superintendent Clarkford Best, couldn't Sony have been seen as the sole cause of the injury? Yes. That was the argument that was raised by, first of all, the trial court noted that as a possibility. We felt that the evidence had been, there was evidence in the record to suggest that that's where the defense was going. However, the reason that doesn't work is because Sony did not, could not have made his discharge without reliance on the false progress note of October 22, and I've read the testimony that was cited on that, so I think that that's key. Counsel has made an argument that he didn't really rely on it. I've read the testimony. The testimony is in the record. I stand on the record. The record shows that while generally he doesn't suspect esophageal injury on the basis of two intubations necessarily, and that was his testimony generally, he was never given the opportunity in this case to do something about, to investigate further. Again, we're talking about hoofbeats. Dr. Minori used that phrase. What hoofbeats is he hearing? Is he hearing horses or zebras? Well, we don't know because Dr. Sony wasn't given the opportunity to find out whether he was on the savanna or in Illinois. He didn't know. The surgeon usually comes in after intubation. He or she is usually not standing there waiting unless they're nervous about something. Right. So did he, is there any evidence in this record that he had any knowledge of Max at the time of this surgery? No. So even being a shadow of Dr. Gandhi and the anesthesiologist usually stays, was Max there? If Max was there, I don't know that the record shows one way or the other. But if Max is there, he's not doing anything except as Dr. Gandhi directs. The person that the surgeon is going to look to is Dr. Gandhi because Dr. Gandhi is the licensed anesthesiologist in the room. But we don't have anything in this record that says Dr. Gandhi said, go get me this or go do that. No, we don't. Once Dr. Sony is there, that is. Yeah, and Vest says he doesn't remember anything. Very quickly, because I heard the beep, in terms of the defense, the complete failure of the defense that was presented in this case, that because of Dr. Gandhi's refusal to acknowledge that an injury even occurred, all the defense experts' opinions were premised on an injury occurring to Bonnie in the operating room prior to Dr. Sony coming in. Every single expert testified to that effect. Everyone. What counsel said is true. It's not really a point of emphasis in the post-trial motion. I'd be hard-pressed to find anything there. I would say that to the extent that he's arguing forfeiture, I acknowledge that forfeiture is a limitation on the parties but not on this court. And I believe that this is a very important question here because it's a question of law. It's not just a 213 violation or some discovery issue. This is a fundamental question as to can you say that there is no injury whatsoever to look with unseeing eyes and deny that an injury occurred and mount a defense based on that when every expert that you've rallied to your cause says that an injury did occur and what that injury was. Rottenberg, the defense expert, the defense standard of care expert, said if we don't rely on what Gandhi says, we're engaging in speculation or conjecture. But it turns out that they only relied on the things that they thought were helpful to them and not on the things that Dr. Gandhi actually said at trial about the position. Even if you don't dispute that there was an injury and there was an injury, isn't it, as the defense said, isn't this a battle of the experts? No. It's not because of the unrebuttedness. I will go back to point one. I'm sliding like Mercury here. But I have to because of the question that you asked. It's not because Dr. Minori's testimony was not sufficient to rebut Dr. Reid on that point. And we've gone through the response to the jury question a number of times. But I'd like to point out that Dr. Minori was not the only testimony he offered on that point. He was asked specifically a question about whether the standard of care requires health care providers to make accurate and truthful entries in medical records. And Dr. Minori responded, that's the whole idea, and I agree. It is the whole idea. This is the record, page 1117. The testimony that Dr. Minori offered in response to the jury question about intentionality is not negligence. I mean, this is a negligence case. You don't have to have a Perry Mason moment in order to prove intention. And even if intention were the standard, the fact that Dr. Gandhi could offer no rational explanation whatsoever for the reason why he wrote the note, acknowledging that he did write the note the way he wrote it, even though he knew otherwise. Do you need intention? No, absolutely not. Absolutely not. One other point real quick before I subside. I believe there was a question about her pain at the time of discharge. This is 7-8. I believe the record will support that. And if that's the case, that's extraordinary pain for a discharge that's pretty high. But, again, Dr. Soni doesn't suspect esophageal perforation because there was, according to the note only. So I'll stand on my brief from here and ask for the relief requested therein and subside. Unless there's further questions. Thank you. Thank you very much. Thank you, counsel, for your arguments this morning. They are enlightening. And we will take this matter under advisement. We're going to stand and recess now for a bit to get ready for our next hearing.